GOLD BENNETT CERA & SIDENER LLP
SOLOMON B. CERA (State Bar No. 99467)
PAMELA A. MARKERT (State Bar No. 203780)
LOUIS A. KESSLER (State Bar No. 243703)
595 Market Street, Suite 2300
San Francisco, California 94105
Tel: (415) 777-2230
Fax: (415) 777-5189
E-mail: scera@gbcslaw.com
E-mail: pmarkert@gbcslaw.com
E-mail: lak@gbcslaw.com

Attorneys for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MAZZAFERRO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ARUBA NETWORKS, INC., DOMINIC P. ORR, MICHAEL M. GALVIN, and KEERTI MELKOTE,<br><br>Defendants. | Case No.: 13-CV-02342 VC<br><br><u>CLASS ACTION</u><br><br>**[CORRECTED]<br>LEAD PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:   January 22, 2015<br>Time:  10:00 a.m.<br>Judge: Honorable Vince Chhabria |

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ....................................................................................................1
II. FALSITY HAS BEEN ADEQUATELY ALLEGED .........................................2
    A. Each Statement Was Materially False and Misleading When Made ....................3
    B. Defendants' False Statements Were Not Mere "Optimism" or "Puffery" ...........7
    C. There Was No Adequate Disclosure of Cisco's Competitive Threat ...................7
    D. Facts are Sufficiently Pled Showing Declining Market Share.............................8
    E. The Alleged Customer Losses Were Material and Were Not Disclosed.............8
III. THE PSLRA'S SAFE HARBOR DOES NOT APPLY .....................................9
    A. Defendants' Misrepresentations Were Not "Forward-Looking" .........................9
    B. There Was No Meaningful Cautionary Language ...............................................9
IV. AN INFERENCE OF SCIENTER IS EQUALLY AS COMPELLING AS DEFENDANTS' NONCULPABLE EXPLANATIONS .................................................9
    A. The CW Allegations ..........................................................................................10
    B. Scienter is Adequately Alleged for the February 2013 Guidance ......................12
    C. Defendants' Involvement in Day-to-Day Operations Supports Scienter............12
    D. Suspicious Employee Departures Supports Scienter .........................................13
    E. Insider Selling By Orr and Melkote Evidence Scienter.....................................14
        1. Orr's Insider Selling............................................................................14
        2. Melkote's Insider Selling....................................................................14
V. CONCLUSION....................................................................................................15

# TABLE OF AUTHORITIES

Cases

*Albert Fadem Trust v. Am. Elec. Power Co., Inc.*
    334 F.Supp.2d 985 (S.D. Ohio 2004) ............................................................................... 13

*Applestein v. Medivation, Inc.*
    861 F. Supp. 2d 1030 (N.D. Cal. 2012) ........................................................................... 10

*Backe v. Novatel Wireless, Inc.*
    542 F.Supp.2d, 1169 (S.D. Cal. 2009) ............................................................................. 15

*Basic Inc. v. Levinson*
    485 U.S. 224 (1988) ........................................................................................................... 1

*Berson v. Applied Signal Tech., Inc.*
    527 F.3d 982 (9th Cir.2008) ..................................................................................... 4, 5, 13

*Brody v. Transitional Hospitals Corp.*
    280 F.3d 997 (9th Cir. 2002) ............................................................................................. 2

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*
    880 F.Supp.2d 1045 (N.D. Cal. 2012) ........................................................................... 6, 7

*Cooper v. Pickett*
    137 F.3d 616 (9th Cir. 1997) ............................................................................................. 8

*Eminence Capital, LLC v. Aspeon, Inc.*
    316 F.3d 1048 (9th Cir. 2003) ......................................................................................... 15

*Fecht v. The Price Co.*
    70 F.3d 1078 (9th Cir. 1995) ........................................................................................... 12

*Feyko v. Yuhe Int'l, Inc.*
    No. CV 11-05511 DPP, 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ................................ 2

*Gammel v. Hewlett-Packard Co.*
    905 F. Supp. 2d 1052 (C.D. Cal. 2012) ........................................................................... 11

*Glazer Capital Mgmt. v. Magistri*
    549 F.3d 736 (9th Cir.2 008) ........................................................................................... 12

*Hopson v. MetroPCS Commc'ns, Inc.*
    2011 WL 1119727 (N.D. Tex. Mar. 25, 2011) .................................................................. 8

*In re Boeing Sec. Litig.*
    40 F. Supp. 2d 1160 (W.D. Wash. 1998) .......................................................................... 3

*In re Daou Sys., Inc.*
    411 F.3d 1006 (9th Cir. 2005) ......................................................................................... 10

*In re LDK Solar Sec. Litig.*
    584 F.Supp.2d 1230 (N.D. Cal. 2008) ............................................................................ 10

*In re Ligand Pharms., Inc., Sec. Litig.*
    No. 04-1620 DMS (LSP), 2005 WL 2461151 (S.D. Cal. Sept. 27, 2005) ........................ 7

# TABLE OF AUTHORITIES

*In re OmniVision Technologies, Inc. Sec. Litig.*
   937 F. Supp. 2d 1090 (N.D. Cal. 2013) .................................................................... 2, 5, 6

*In re Portal Software, Inc., Sec. Litig.*
   No. 03-5138 VRW, 2005 WL 191923 (N.D. Cal. Aug. 10, 2005) ..................................... 9

*In re Questcor Sec. Litig.*
   No. 12-01623 DMG, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ......................... 5, 13, 14

*In re STEC Inc. Sec. Litig.*
   SACV 09-1304 JVS, 2011 WL 2669217 (C.D. Cal. June 17, 2011).............................. 4, 5

*In re Ubiquiti Networks, Inc. Sec. Litig.*
   No. 12-CV-4677 YGR, 2014 WL 1254149 (N.D. Cal. Mar. 26, 2014) ............................ 3

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*
   403 F.3d 1050 (9th Cir. 2005) .......................................................................................... 9

*Matrixx Initiatives Inc. v. Siracusano*
   131 S. Ct. 1309 (2011)................................................................................................. 1, 3

*Miller v. Thane Int'l, Inc.*
   519 F.3d 879 (9th Cir. 2008) ............................................................................................ 6

*Morgan v. AXT, Inc.*
   No. 04-4362 MJJ, 2005 WL 2347125 (N.D. Cal. Sept. 23, 2005) ..................................... 7

*Mulligan v. Impax Labs., Inc.*
   No. C-13-1037 EMC, 2014 WL 1569246 (N.D. Cal. Apr. 18, 2014) ................................ 2

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*
   320 F.3d 920 (9th Cir.2003) ................................................................................. 9, 14, 15

*Police Re. Sys. of St. Louis v. Intuitive Surgical, Inc.*
   759 F.3d 1051 (9th Cir. 2014) .......................................................................................... 7

*Reese v. Malone*
   747 F.3d 557 (9th Cir. 2014) .............................................................................. 4, 11, 12

*Siracusano v. Matrixx Initiatives, Inc.*
   585 F.3d 1167 (9th Cir. 2009) *aff'd,* 131 S. Ct. 1309 (2011)............................................ 7

*Tellabs, Inc. v. Makor Issues and Rights, Ltd.*
   551 U.S. 308 (2007)................................................................................................. 10, 13

*U.S. v. Laurienti*
   611 F.3d 530 (9th Cir. 2010) ............................................................................................ 4

*Warshaw v. Xoma Corp.*
   74 F.3d 955 (9th Cir. 1996) .............................................................................................. 7

*Zucco Partners, LLC v. Digimarc Corp.*
   552 F.3d 981 (9th Cir. 2009) .......................................................................................... 10

<u>Statutes</u>

15 U.S.C. § 78u-4(b)(1) ............................................................................................................. 2

# TABLE OF AUTHORITIES

15 U.S.C. §78j(b) .................................................................................................................................. 1

17 C.F.R. § 240.10b–5 ..................................................................................................................... 1, 4

## I.     INTRODUCTION

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), requires that in connection with the purchase or sale of securities of a publicly traded company, there be disclosure of all information that would be significant to the purchase decision of a reasonable investor. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011), citing *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988). *See also* SEC Rule 10b-5, 17 CFR §240.10b-5. Defendants violated this bedrock rule of securities law during the Class Period. They misled purchasers of defendant Aruba Networks, Inc.'s ("Aruba" or the "Company") securities regarding the impact on Aruba's business of competition from Cisco Systems, Inc. ("Cisco"). Notwithstanding repeated opportunities to tell the truth to securities analysts in response to their specific questions regarding Cisco, Aruba's senior officers dissembled. They outright **denied** that Cisco was hurting Aruba's business, while knowing at the same time that at least three large enterprise accounts were lost to Cisco because of the latter's bundling strategy and access to executive decision-makers, which Aruba did not have. In the words of CEO Orr at the end of the Class Period, "it is no longer a CIO decision, it's a CFO decision. And at that point in time, **we cannot compete**." ¶140.[1] During the Class Period Defendants aggressively touted the precise opposite, that Aruba was **winning** the competition with its largest competitor, at one point even falsely suggesting that Cisco had given up competing with Aruba. ¶81. Upon Aruba's admission that "we cannot compete" with Cisco, the Company lost 40% of its market capitalization. Class members who purchased Aruba shares on the open market during the Class Period in reliance on the integrity of the stock price as reflecting all available material information, **including with regard to the impact of competition from Cisco**, were injured and have stated a plausible claim for relief which is entitled to be tested through discovery.

In response to the Court's August 1, 2014 Order Granting Motion to Dismiss With Leave to Amend (ECF No. 89) ("Order"), and based on its continuing investigation, Lead Plaintiff has

---

[1]     Citations to "¶__" are to paragraphs of the Second Amended Complaint ("SAC") (ECF No. 95).

LEAD PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
Case No. 13-cv-02342-VC                                1

1  dramatically revised its allegations as reflected in the SAC.  First, the Class Period has been
2  significantly shortened.  It is now August 23, 2012 through May 16, 2013, to focus on the period
3  in which three Aruba senior officers made highly specific – and demonstrably false – statements
4  respecting how competition from Cisco was not adversely affecting Aruba.  Second, the SAC
5  alleges a new, key factual predicate relevant to both falsity and scienter.  Specifically,
6  Defendants, using information obtained from Salesforce software, accessed real time, up-to-the
7  minute information about how Aruba was faring in terms of its wins and losses—and the reasons
8  for those losses—of large enterprise accounts.  This allegation places information about multiple
9  key customer losses directly in the hands of the Defendants at the times they repeatedly stated
10 Aruba's business was **not being hurt** by competition from Cisco.  Third, several newly
11 identified confidential witnesses ("CWs") have provided additional detailed factual information
12 which significantly bolsters the falsity and scienter allegations.

## II.    FALSITY HAS BEEN ADEQUATELY ALLEGED

The SAC fully complies with the Private Securities Litigation Reform Act's ("PSLRA") requirements pertaining to the identification of statements alleged to be false or misleading, and addresses the deficiencies cited in the Order.  It specifies each misrepresentation or omission and describes the reasons why each is false or misleading.  15 U.S.C. § 78u-4(b)(1); ¶¶58-92.  The Court must view an allegedly false statement "in full and in context at the time it was made." *Mulligan v. Impax Labs., Inc.*, No. C-13-1037 EMC, 2014 WL 1569246, at *14 (N.D. Cal. Apr. 18, 2014).  For an omission to be misleading, "it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Mulligan,* 2014 WL 1569246 at *12 (citing *Brody v. Transitional Hospitals Corp.,* 280 F.3d 997, 1006 (9th Cir. 2002).  Importantly, a plaintiff can survive a motion to dismiss by alleging a single material misrepresentation.  *See In re OmniVision Technologies, Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1101 (N.D. Cal. 2013) (denial of motion to dismiss where only two of a multitude of statements were found misleading); *Feyko v. Yuhe Int'l, Inc.,* No. CV 11-05511 DPP, 2013 WL 816409 at *4 n.2 (C.D. Cal. Mar. 5, 2013).  It is well-settled that defendants can be liable for statements made on analyst conference calls.  *See In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 12-CV-4677

YGR, 2014 WL 1254149, at *15 (N.D. Cal. Mar. 26, 2014). Applying these principles, the SAC has adequately alleged one or more materially false statements or omissions.

### A. Each Statement Was Materially False and Misleading When Made

**False Statement #1**: On August 23, 2012, Orr represented that in competition for large enterprise customers against Cisco, Aruba was "**very differentiated**" and "**in the most superior position**" and had been for "**the last 12 months**." ¶63. Immediately prior to the August 23 earnings call, however, Aruba had lost a $50 million contract, JCPenney, to Cisco whereby Aruba was the incumbent Wi-Fi provider. ¶62. Significantly, the loss of JCPenney was not a one off aberration because Aruba had lost another large enterprise client, MGM, to Cisco in August. ¶65. Aruba lost the MGM account because its technology was not "differentiated" or "superior." It was inferior to Cisco's and, according to CW10, Cisco had been working directly with executive management at MGM to sell a complete, bundled package, while Aruba was working with MGM's IT people and was unable to offer the product bundling that Cisco presented. ¶¶65, 66. Aruba identified in its Form 10-K Annual Reports the "loss of significant customers as a risk factor potentially affecting its stock price. ¶66. Yet, when Defendants had **actual knowledge** of the loss of specific large customers they omitted to disclose this information. Once Defendants chose to speak about Cisco, they had a duty to do so accurately and fully without omitting any material information. *In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1167 (W.D. Wash. 1998); *see also Matrixx*, 131 S. Ct. at 1321-1322 (disclosure is required when doing so would render the "statements made, in the light of the circumstances under which they were made, not misleading.").

**False Statement #2**: On September 12, 2012, Melkote and Galvin were questioned about Aruba's competitive position vis-à-vis Cisco, to which Melkote stated "when it comes to actual competing for a deal, we have not seen a big difference in terms of either pricing dynamics or in terms of our ability to win." ¶67. Melkote further represented Aruba's mobile solutions gave Aruba a competitive edge because Cisco was "**a wired-first company. CIOs know that, too. And once you get that in, then it's a genuine true bake off that we're going to go win against."** *Id*. These statements were false and misleading and omitted material facts,

including that Aruba had just recently lost two significant incumbent accounts (JCPenney and MGM) in a "bake-off" with Cisco. ¶52, 61, 68. Rule 10b–5(b) "prohibits the telling of material lies and prohibits the telling of material half-truths, where the speaker 'omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *In re STEC Inc. Sec. Litig.*, SACV 09-1304 JVS, 2011 WL 2669217 at *5 (C.D. Cal. June 17, 2011) (citing *U.S. v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) (quoting 17 C.F.R. § 240.10b–5)); *see also Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) (omitting information affirmatively created an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]" ) (citing *Berson,* 527 F.3d at 985).

**False Statement #3**: On November 15, 2012, Orr again specifically addressed the large enterprise Wi-Fi market, stating: "[W]e compete against Cisco. **And we continue to win through the differentiation of our security, scalability and application … These are all areas where Aruba is the technology leader.**" ¶72. In addition to the JCPenney and MGM losses, Aruba had lost yet another account at this point, its largest to date, Safeway, in November 2012 according to CW10. ¶¶70, 76. Per CW5, Cisco's approach involved the bundling of a wireless and wired component that had been pitched by Cisco directly to the customer's CFO, which was the same reason for the MGM loss. ¶71. CW10 stated that Orr's statements on November 15, 2012 were untrue and misleading because two-thirds of the Company's salespeople were failing to make their sales quotas at that time. ¶72.[2] CW11 likewise stated that Orr's November 15, 2012 statements were untrue because Cisco had by this date unveiled a high-speed wireless network that customers were finding to be a better product than Aruba's. *Id*. CW11 stated "there is no way what Orr said [on November 15, 2012] is true because Cisco was fiercely competitive and we were just doing all we could to keep the ship from sinking." *Id*. Defendants' statements gave investors the false impression that Aruba had a technological edge.

---

[2] During this same period, the Individual Defendants privately acknowledged to CW1 very serious concerns re Cisco. ¶69.

But as confirmed by the 3Q 2013 results, that was not the case. *See* ¶¶138-47; *OmniVision*, 937 F. Supp. 2d at 1101 ("Lead plaintiffs are correct that whether a statement is misleading is a fact-intensive inquiry and that context matters. Nor is it sufficient for avoiding liability that a statement is literally true."); *STEC,* 2011 WL 2669217 at *6–9.

**False Statement #4**: On February 21, 2013, during the quarterly earnings call, analysts repeatedly questioned Defendants regarding Aruba's ability to compete against Cisco. ¶81. Melkote claimed that for "**90 days or more**" Cisco **had not been competing with Aruba** based on technology, and that Aruba's "competitive rate, win rate actually has not gone down." *Id*. Melkote went further, dismissing Cisco's "formidable" pricing and bundling capabilities, stating "**that more and more they've had to do more of that because we feel good about our win rate on a technological differentiation basis**." *Id*.  This statement was made three months after the stinging loss to Cisco of Aruba's biggest customer, Safeway.  Melkote was touting "technological differentiation" to the investing public while privately the Safeway loss was being used as a learning tool in meetings of Aruba's salespeople. ¶71.  Once Defendants chose to speak about Cisco, they had a duty to do so accurately and fully without omitting any material information, *i.e.*, that Aruba's purported technological differentiation was irrelevant because of Cisco's pricing, bundling and targeting high-level decision-makers to purchase its products.  *See In re Questcor Sec. Litig.,* No. 12-01623 DMG, 2013 WL 5486762, at *14 (C.D. Cal. Oct. 1, 2013) ("[B]y touting Acthar's success in the market, Defendants were 'bound to do so in a manner that wouldn't mislead investors.'") (citing *Berson,* 527 F.3d at 987).

**False Statement #5**: On February 21, 2013, after the market close, Galvin represented that Aruba, "expect[s] Q3 '13 revenue to be in the range of $159 million to $161 million, and the increase of 21% to 22% year-over-year and 2% to 4% sequentially." ¶83.  Galvin (who spoke) and Orr (who was present), knowingly or recklessly disregarded the most current financial information available to them from Salesforce which they had accessed on a daily basis before issuing the statement, which materially undermined the guidance. ¶¶55, 56.  *See* Section VI.B, *infra*, at 12.

LEAD PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
Case No. 13-cv-02342-VC                          5

**False Statement #6**: At a March 27, 2013 analyst conference, Orr's concluding remarks discussed near-term revenue, stating: **"for indication of our revenue momentum that we judge is our project pipeline.  Project pipeline . . . have never been better before in the history of the company."**  ¶86.  The "project pipeline" in this context means the existing and forecasted revenue information as reflected in Salesforce.  *Id.*  Orr's statement was one of existing fact.  *Id.*  At no point did any Defendant reference Cisco's success in taking business from Aruba as alleged in the SAC, or make reference to delays in closing deals because purchase decisions were now being reviewed by CFOs and other high level executives of its customers, let alone the actual loss of their key enterprise clients.  ¶86.  *See Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.") (citation omitted).

**False Statement #7**: On May 7, 2013, Aruba issued a press release preannouncing that it would be reporting lower financial results for the third fiscal quarter 2013 to $147 million, or $14 million less Aruba's previously announced guidance and $8 million less than Aruba's revenue during the second fiscal quarter.  ¶88.  In the press release, Orr said, "In April, we saw a push out in customer orders across the Americas, Europe and Asia.  **We attribute this weakness primarily to a challenging economic environment worldwide**.  ¶89.  Although the sales and revenue information through April 30, 2013 was in Salesforce – which Orr reviewed daily – he did not inform the market the true reason for the Company's decline in revenue and non-GAAP net income of almost 50%, *i.e.,* the **actual loss** of several large enterprise accounts to Cisco.  ¶90.[3]  The CW information and end of Class Period admissions confirm Aruba was losing significant large enterprise accounts to Cisco for reasons other than macroeconomic factors.  *OmniVision*, 937 F. Supp. 2d at 1102 ("the alleged statements here are closer to the subject of nondisclosure in that both relate generally to OmniVision's customer base").

---

[3]   *Cf. City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,* 880 F.Supp.2d 1045, 1065 (N.D. Cal. 2012) (discussing insufficiency of information referred to in executive overview reports to give rise to scienter.)

### B. Defendants' False Statements Were Not Mere "Optimism" or "Puffery"

The false statements and omissions go to the core of Aruba's business and were in response to specific questions from analysts regarding a topic – competition with Cisco – that was critical to the market's evaluation of the Company. ¶¶72, 73, 75-77, 81, 86, 91, 139-146. There was **no** reference by Aruba's senior management to "crystal balls," caution due to extraneous concerns such as the 2008 economic crisis, or "strong demand metrics and good momentum. *See Police Re. Sys. of St. Louis v. Intuitive Surgical, Inc.,* 759 F.3d 1051, 1060 (9th Cir. 2014) and *Royal Oak,* 880 F.Supp.2d at 1064. Instead, the Defendants' responses regarding competition from Cisco were definitive. ¶¶67, 72. Such specific statements made to quell investor concerns are not puffery. *See Warshaw v. Xoma Corp.,* 74 F.3d 955, 959-60 (9th Cir. 1996); *Morgan v. AXT, Inc.*, No. 04-4362 MJJ, 2005 WL 2347125, at *10 (N.D. Cal. Sept. 23, 2005). Many of Defendants' statements were not "generalized statements of corporate optimism, but [a] response[] to specific questions posed during the conference calls." *In re Ligand Pharms., Inc., Sec. Litig.*, No. 04-1620 DMS (LSP), 2005 WL 2461151, at *20 (S.D. Cal. Sept. 27, 2005); *see, e.g.,* ¶¶63, 67, 75, 76, 77, 81, 82 (responding directly to analyst questions about competition from Cisco).

### C. There Was No Adequate Disclosure of Cisco's Competitive Threat

No cautionary language addressing the change in Cisco's strategy or the impact of its competition was ever provided in any Class Period filing. ¶59. On earnings calls and at analyst conferences, any suggestion of Cisco's dominance in the market was immediately dismissed or discounted. *See, e.g.,* False Statement #4. Defendants knew throughout the Class Period that Cisco had changed the game, and therefore had a duty to update their disclosures to reflect that Cisco's new strategy had borne fruit in a manner that was seriously hurting Aruba. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) *aff'd,* 131 S. Ct. 1309 (2011) (SEC filing "speaks entirely of as-yet-unrealized risks and contingencies. Nothing alerts the reader that some of these risks may already have come to fruition").

### D. Facts are Sufficiently Pled Showing Declining Market Share

Defendants argue that only one statement in the SAC refers to "gaining share," and that "the remaining statements merely express optimism regarding technological differentiation and competitive positioning." MTD at 7 (citing ¶¶75, 81). This is wrong, and conveniently glosses over the following statements: (1) August 23, 2012 - "We are gaining share [against Cisco]" (¶63); (2) September 12, 2012 – "And once you get that in, then it's a genuine true bake off that we're going to go win against." (¶65) – made after loss of MGM account; and (3) November 15, 2012 – "[W]e continue to win through [] differentiation" (¶72) – made after the loss of Safeway. These statements are not puffery as addressed in *Hopson v. MetroPCS Commc'ns, Inc.*, 2011 WL 1119727, at * 21 (N.D. Tex. Mar. 25, 2011). Indeed, they are far beyond expressions of optimism. They are statements of **winning the competition against Cisco**, gaining share in the enterprise market, and are capable of objective verification.

### E. The Alleged Customer Losses Were Material and Were Not Disclosed

Defendants argue Aruba was not obligated to disclose the loss of three customers (JCPenney, MGM, Safeway) in light of what Defendants characterize as continued revenue growth. MTD at 8. Defendants are wrong. It is not necessary in order for Plaintiffs to state a valid claim to specifically tie the omissions regarding the severe impact of Cisco competition to specific revenue declines. *See, e.g., Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (no requirement to specify dollar amount of improperly, recognized revenue). First, Aruba failed to meet its revenue projections because of competition from Cisco. ¶138-40. Second, analysts were focused on whether Aruba could even compete with Cisco. ¶75. Third, Orr's admission that "we cannot compete" was a direct disavowal of all prior Class Period statements that Aruba was "winning." Moreover, his admission shattered Aruba management's credibility with the analysts. ¶¶140-46. All of this contributed to a devastated stock price. ¶147.[4]

---

[4] The fact that Aruba – after the Class Period – earned substantial revenue is of no legal significance. This case is about Class Period misstatements that were directly connected to the announced May 16, 2013 revenue miss, and Orr admitted as much. ¶147.

## III. THE PSLRA'S SAFE HARBOR DOES NOT APPLY

### A. Defendants' Misrepresentations Were Not "Forward-Looking"

The PSLRA safe harbor provision does not apply to statements or omissions of present or historical fact. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 403 F.3d 1050, 1056-57 (9th Cir. 2005) (extension of safe harbor to statements of historical fact is inappropriate); *In re Portal Software, Inc., Sec. Litig.*, No. 03-5138 VRW, 2005 WL 191923, at *13 (N.D. Cal. Aug. 10, 2005). In addition, the Ninth Circuit has recognized that "statements couched in the future tense, but whose effect is to convey information about the present," are not accorded safe harbor protection. *S. Ferry*, 399 F. Supp. 2d at 1131, *vacated on other grounds*, 542 F.3d 776 (9th Cir. 2008) (citing *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 936, 937 (9th Cir. 2003)). Defendants' statements are actionable because they misrepresented historical and present facts regarding Aruba's supposed success in thwarting Cisco's efforts to take existing and new clients from Aruba. ¶¶63, 75, 80, 86.

### B. There Was No Meaningful Cautionary Language

The generalized "cautionary language" at issue does not preclude liability here because of facts in existence at the time Defendants' false and misleading statements were made. Defendants knew that Aruba specifically competed with Cisco's entire product line and that its pricing and bundling strategy put Cisco in the room with the top decision makers of Aruba's existing and potential customers. Aruba's Form 10-Q for the quarter ended April 30, 2013, filed June 6, 2013 (post Class Period) is illustrative. It deleted reference to the Cisco "Wireless Networking Business Unit" and added "**some of our competitors offer a broader range of products than we do, which could allow them to bundle products in a manner that make it challenging for us to compete based on price.**" ¶101. No such disclosure was made during the Class Period even though these facts were extant at that time. ¶99.

## IV. AN INFERENCE OF SCIENTER IS EQUALLY AS COMPELLING AS DEFENDANTS' NONCULPABLE EXPLANATIONS

Courts must "determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter," by "considering plausible nonculpable explanations for

the defendant's conduct, as well as inferences favoring the plaintiff"–the latter which need "not be irrefutable, *i.e.*, of the 'smoking-gun' genre." *In re LDK Solar Sec. Litig.*, 584 F.Supp.2d 1230, 1241 (N.D. Cal. 2008) (citing *Tellabs, Inc. v. Makor Issues and Rights, Ltd.,* 551 U.S. 308, 323 (2007).

### A. The CW Allegations

The CW allegations support a finding that scienter has been adequately alleged. "A complaint relying on statements from CWs satisfies the PSLRA's pleading requirements if: (1) it 'provide[s] an adequate basis for determining that the witnesses in question have personal knowledge of the events they report'; and (2) the confidential witnesses' statements are 'themselves indicative of scienter.'" *Greenberg*, 2013 WL 100206, at *7 (citing *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 995 (9th Cir. 2009)). "The Court must also look at 'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Applestein v. Medivation, Inc.,* 861 F. Supp. 2d 1030, 1037 (N.D. Cal. 2012) (*quoting Zucco,* 552 F.3d at 995). The information obtained from the new CWs corroborates the previously-identified CWs' information, which the Court found, standing alone, to be insufficient. Order at 2. Together, the eleven CWs provide compelling detail regarding what was known by the Individual Defendants during the Class Period.

The CW allegations are made with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys., Inc.,* 411 F.3d 1006, 1015 (9th Cir. 2005). Indeed, ten of the eleven CWs were employed by Aruba and were therefore uniquely (and adequately) positioned to know the facts they have provided. *See id.* (finding CW accounts sufficient to meet PSLRA's pleading requirements when the complaint described, *inter alia*, job responsibilities and "exact job titles").

Defendants' attempt to mischaracterize or ignore important facts provided by the CWs fails. For example, institutional investor CW1 did not merely hear from analysts in mid-2012 that Cisco was becoming aggressive. MTD at 6. The SAC alleges CW1 followed up by

1 **speaking with** each of the Individual Defendants **continually** through the end of 2012 regarding Aruba's business and was told privately that they were aware and concerned about specific bundling tactics (*i.e.,* promotions, pricing tactics, free equipment) used by Cisco **that were not disclosed to the market**. ¶¶28, 69.

Defendants take issue with the fact that CW5 is not alleged to have had direct contact with Orr (MTD at 9); however, that CWs are not alleged to have spoken directly to Defendants does not diminish the value of their information. *See Gammel v. Hewlett-Packard Co.,* 905 F. Supp. 2d 1052, 1073 (C.D. Cal. 2012) ("reliance on hearsay does not automatically render confidential witness statements unreliable," and certainly not where there is plenty of corroborating evidence to support the hearsay reported); *see also Reese*, 747 F.3d at 572 (employee "bridge[d] the [scienter] gap" herself by referencing the data directly" citing *S. Ferry,* 542 F.3d at 783). CW5, a Territory Manager, reported that prior to losing the Safeway account to Cisco, there were weekly conference calls involving senior sales executives discussing efforts to retain the account and the ultimate loss of the account, and defendant Orr was personally informed of the status of the Safeway deal. ¶71. Consistent with information provided by CW5, CW10 knew, in his capacity as a Territory Manager, that Orr was personally involved with attempting to retain Safeway. ¶71.[5]

Defendants' attempts to selectively parse the information provided by CWs 8-11 also fail. CWs 8 and 9 do not merely identify the existence of Aruba's use of Salesforce, and CWs 10 and 11 do not provide "opinions" or "speculation." MTD at 9-10. To the contrary, the daily use of Salesforce by the Individual Defendants, and the abundance of financial information contained in it and the reports generated from it, have been confirmed by these CWs, all of whom were employed in management or vice president positions at Aruba and who also had access to the Salesforce reports and provided specific facts about the reports used by Defendants. ¶¶54-57. The factual allegations from these CWs are based on their personal knowledge and actual use of

---

[5] Information provided by Channel Operations Analyst CW7 makes clear that Cisco's new sales strategy and the loss of Safeway was so significant that it was known even at lower levels within Aruba. ¶71.

Salesforce to access data (¶54-55, 57), attendance at meetings that analyzed the Safeway loss (¶71) and their knowledge of what Cisco was doing in terms of competition because, as Territory Managers, they were in the field going toe-to-toe against Cisco. CW10 unequivocally stated that Orr's statements on November 15, 2012 were untrue and misleading because two-thirds of the Company's salespeople were failing to make their sales quotas at that time. ¶72. CW11 likewise stated that Orr's November 15, 2012 statements were untrue because Cisco had by this date unveiled a high-speed wireless network that customers were finding to be a better product than Aruba's. ¶72. CW8, the Vice President of IT who was employed during the Class Period, had direct knowledge of Orr and Galvin's daily review of Salesforce reports. ¶56. **CW8 was present at meetings with Orr and Galvin when the Salesforce reports were reviewed and discussed**. ¶56. This establishes that both Orr and Galvin knew when large enterprise customers were lost to Cisco and why. Factual allegations such as these are distinguishable from situations where information may have been obscured from high-level executives. *Cf., Glazer Capital Mgmt. v. Magistri,* 549 F.3d 736, 743–49 (9th Cir. 2008).

### B. Scienter is Adequately Alleged for the February 2013 Guidance

The scienter allegations with regard to the February 2013 guidance are not limited to the temporal proximity of that statement and the May 7, 2013 press release, as defendants wrongly suggest. MTD at 13 n.8. However, the timing does strongly support the scienter allegation as to this statement. *See Fecht v. The Price Co.,* 70 F.3d 1078, 1083 (9th Cir. 1995) ("shortness in time" between positive statements on January 14-16 and later disclosure on April 2 constituted circumstantial evidence that the optimistic statements were false when made). In addition, circumstantial evidence provided by temporal proximity is given "more weight in view of the absence of any indication of an intervening catastrophic event." *Id*. at 1083-84. *See also* ¶¶57, 72, 93, 140. These facts show Defendants had no reasonable basis for the guidance and were aware of facts tending to seriously undermine its accuracy. *Reese*, 747 F.3d at 579.

### C. Defendants' Involvement in Day-to-Day Operations Supports Scienter

While a plaintiff may not rely solely on the "core-operations" inference to support a finding of scienter, it is a factor the Court may consider as part of its holistic assessment of the

1  allegations.  *See S. Ferry*, 542 F.3d at 784 (citing *Tellabs*, 551 U.S. at 326).  The allegations
2  "may independently satisfy the PSLRA where they are particular and suggest that defendants had
3  actual access to the disputed information," and may also be sufficient "where the nature of the
4  relevant fact is of such prominence that it would be 'absurd' to suggest that management was
5  without knowledge of the matter.  *Id.* (citing *Berson,* 527 F.3d at 988).

6        Orr, Melkote, and Galvin, Aruba's CEO, CTO and CFO, respectively, had real time
7  access to and reviewed the Salesforce reports and, in the case of Orr and Melkote, were directly
8  involved in sales and retention of large enterprise customers.  ¶¶54-56, 71.  These individuals
9  were the most senior executives at the Company, and were directly involved in Aruba's day-to-
10 day operations, as evidenced by their statements made on conference calls and at investor
11 conferences.  *See Questcor,* 2013 WL 5486762, at *19.  It is truly absurd to suggest they were
12 unaware of the adverse facts alleged in the SAC regarding competition from Cisco, especially in
13 light of the Salesforce and CW information.

14       **D.**       <u>**Suspicious Employee Departures Supports Scienter**</u>

15       Defendants dismiss the relevance of the abrupt departure of Damien Eastwood.  Mr.
16 Eastwood suddenly quit his positions as Aruba's General Counsel, Secretary, and Chief
17 Compliance Officer in March or April 2013, weeks before the devastating 3Q2103 earnings
18 announcement.  ¶97.  The sudden departure of such a high ranking executive so close in time to
19 the disclosure causing a 40% drop in market capitalization is all the more suspicious by his
20 exiting comment, "I'm out of here and you will soon find out" why.  ¶¶97-98; *e.g., Albert Fadem*
21 *Trust v. Am. Elec. Power Co., Inc.,* 334 F.Supp.2d 985, 1014 (S.D. Ohio 2004) (resignation of
22 executive can be probative of scienter if plausible explanation offered for its significance).  Here,
23 a reasonable inference is that Mr. Eastwood wished to dissociate himself from Aruba because it
24 was forced to admit to publishing false financial information.  Unlike other high ranking
25 executives who departed Aruba, Eastwood did not remain until the end of the quarter, as was the
26 Company's practice.  *See Zucco,* 552 F.3d at 1002.

27
28

### E. Insider Selling By Orr and Melkote Evidence Scienter

#### 1. Orr's Insider Selling

Orr sold 550,800 shares during the nine-month Class Period, in contrast with selling a mere 52,896 shares in the twelve months prior to the Class Period. ¶¶109, 111. "Insider trading is unusual or suspicious, and therefore evidence of scienter, when stock sales are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Am. West,* 320 F.3d at 938. Such is the case with Orr's insider selling. For a three and a half month period starting January 14, 2013 through May 1, 2013 when the stock was trading at peak prices, Orr sold 283,200 shares, which was more than all the shares he sold in 2012. ¶¶109, 111. Orr's sales during this narrow time period were at Class Period highs and represented 55% of the $12.2 million in gross proceeds Orr obtained during the Class Period. ¶109. During the Class Period, Orr executed 24 trades, selling 550,800 shares for proceeds of $12.2 million, in comparison to 3 trades of 52,896 shares for $1.1 million in the prior twelve months, an eight-fold increase in the number of trades and a more than ten-fold increase in both shares and proceeds. ¶¶109, 111. *See Questcor*, 2013 WL 5486762 at *17 (timing of sales suspicious where defendants repeatedly sold shares, as many as 14 times, many of which were after significant jumps in stock price).

#### 2. Melkote's Insider Selling

In the twelve months preceding the Class Period, Melkote executed three trades, selling 76,000 shares. ¶122. In comparison, he sold 124,228 shares in less than five months using a trading plan adopted during the Class Period. ¶¶121-22. Melkote's trading history in 2011 was also dramatically different as he sold a fixed amount of shares in a single trade at the beginning of each month under a purported trading plan adopted on December 29, 2010. ¶¶126-27. This historical trading activity does not remotely resemble his Class-Period trades, when he engaged in multiple monthly trades of varying amounts in December 2012, January 2013 and March 2013. ¶120. Melkote also traded in a pattern suspiciously similar to Orr in that $2,561,075, or 75%, of his proceeds were generated during the last four months of the Class Period between January 1, 2013 and May 1, 2013. ¶120. During that time, he sold 73% of the total shares he

sold during the Class Period. ¶120. Nearly 23% of Melkote's proceeds during the Class Period—almost $800,000—were generated in March 2013 alone when the stock was trading at peak prices, inflated by Defendants' (including Melkote's) materially misleading statements. ¶120; *see Am. West*, 320 F.3d at 939 (stock sold near peak price and just prior to stock's decline is "troubling"); *Backe v. Novatel Wireless, Inc.,* 542 F.Supp.2d, 1169, 1184-85 (S.D. Cal. 2009) (defendants unloading stock near in time to market disclosure supports inference of scienter); *Cf. Ronconi,* 253 F.3d at 435 (no strong inference when insiders "miss[ed] the boat," by selling stock before peak prices). Plaintiff has adequately alleged a primary violation of Section 10(b) and that Orr, Melkote and Galvin exercised control over Aruba. ¶¶15-17, 63,67, 68, 72-89, 148-55, 167-78. Defendants do not dispute that Plaintiff purchased Aruba stock contemporaneously with certain sales of Aruba stock by Orr and Melkote (¶¶103, 190); therefore, the Section 20A claim should not be dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied. Lead Plaintiff is cognizant of the fact that the Court, in its discretion, declined to hear oral argument on the first motion to dismiss. Lead Plaintiff believes that argument would be of assistance to the Court in its evaluation of the present motion and therefore respectfully requests oral argument.[6]

Dated: November 26, 2014

GOLD BENNETT CERA & SIDENER LLP

 /s/Pamela A. Markert
Pamela A. Markert

Attorneys for Lead Plaintiff

---

[6] In the event the Court determines that the SAC fails to state a claim, plaintiff respectfully requests leave to file a motion to amend to cure any deficiency. In *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003) the Ninth Circuit recognized that pleading a PSLRA-compliant complaint is a daunting task and encouraged granting leave to amend. While the Court in the Order characterized the SAC as the "last and best" shot, Lead Plaintiff has continued investigating the facts and believes it can further bolster the allegations, should that be deemed necessary. There is no rule that a second complaint is the end of the line. In this demanding area of the law, a further amendment, if necessary, would be appropriate.