UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MAZZAFERRO, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>ARUBA NETWORKS INC, et al.,<br><br>    Defendants. | Case No. 13-cv-02342-VC<br><br>**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Re: Doc. No. 98 |

The motion to dismiss is granted, because the second amended complaint ("SAC") does not cure the defects contained in the prior iteration. That is to say, the plaintiffs still do not identify any statements by Aruba or its executives that were false or materially misleading.

The plaintiffs' theory of securities fraud is summed up in Paragraphs 3, 4 and 5 of the SAC. The theory largely rests on the assertion that Aruba concealed the threat from its primary competitor, Cisco, in the competition for WLAN customers:

> [R]ather than competing for WLAN customers on a purely technological basis, which was Aruba's strongest selling point, in 2012 Cisco began an aggressive sales campaign which entailed cutting prices, bundling its wired and WLAN products, and offering data center upgrades, thereby promoting itself as a complete, integrated computer network solution. Since WLAN cannot exist without a wired infrastructure and Aruba does not sell wired LAN products, Cisco's ability to provide both wired and wireless solutions was highly effective in taking revenue and market share from Aruba, as large enterprises upgraded their wired networks and implemented Cisco's WLAN solutions at a more competitive price than if they separately purchased the wired components from Cisco and the wireless components from Aruba. . . . Defendants were aware of the effectiveness of Cisco's aggressive new sales strategy throughout the Class Period . . . . Defendants deflected and dissembled in the face of repeated inquiries from analysts attempting to learn the facts as to how Aruba was faring against Cisco.

SAC at ¶¶ 3-4.

1   But this assertion is largely contradicted by statements Aruba and its executives actually
2   made during the class period. For example:

- In its Form 10-K for the period ending July 31, 2012, and filed with the SEC in October 2012, Aruba stated that it expected competition to "intensify in the future," and that this competition "could result in increasing pricing pressure, reduced profit margin, increased sales and marketing expenses and failure to increase, or the loss of, market share . . . ." Doc. No. 98, Walters Decl., Ex. 4 at 12, 18.[1] Aruba included this same disclosure in its Form 10-Q for the periods ending October 31, 2012, January 31, 2013, and April 30, 2012. *See id.*, Ex. 6 at 35, Ex. 9 at 37, Ex. 28 at 34.

- The Form 10-K also stated: "Currently, we compete with a number of large and well established public companies, including Cisco Systems . . . any of which could reduce our market share, require us to lower our prices, or both." *See id.*, Ex. 4 at 18. Aruba included this same disclosure in its Form 10-Q for the periods ending October 31, 2012, January 31, 2013, and April 30, 2012. *See id.*, Ex. 6 at 36, Ex. 9 at 37, Ex. 28 at 34.

- On February 21, 2013, Defendant Orr acknowledged to analysts that Cisco had adopted a bundling strategy to counteract Aruba's technological superiority, which is exactly the thing that Paragraph 4 alleges Aruba concealed. Orr stated: "We're seeing more and more of a gap in their engagement [with us over a potential customer], their wireless LAN sales force trying to hide behind their wired counterparts but bury themselves with some kind of data center upgrade or router refresh or leasing program or anything other than head-to-head technical competition. . . . more and more they've had to do more of that because we feel

---

[1] The Court takes judicial notice of Exhibits 4, 6-12, 18, 23, 27, and 28, which were submitted by the defendants in support of their motion to dismiss. *See* Doc. No. 98, Walters Decl. These exhibits are documents referenced in the SAC, and the plaintiffs do not object to them. *See* Doc. No. 100. With respect to the remaining exhibits, the defendants' request for judicial notice is denied as moot.

United States District Court
Northern District of California

2

good about our win rate on a technological differentiation basis."  SAC ¶ 81; Ex. 8 at 13.

These statements show that it was no secret that Cisco was a formidable competitor.  Nor was it a secret that Cisco used its advantage as a larger and more established company to avoid a pure head-to-head competition with Aruba (that is, a competition based solely on quality of the companies' respective WLAN products) for WLAN customers, such as by bundling its wired product with its WLAN products.

The plaintiffs' theory of securities fraud also rests on the assumption that Cisco was beating Aruba in the competition for wireless customers during the class period and that Aruba's market share was decreasing.  Returning to Paragraph 4 and continuing on to Paragraph 5, the plaintiffs allege as follows:

> Aruba repeatedly and falsely denied that Cisco was taking market share from the Company or that it had become a material threat to Aruba's business. . . . Rather than address the true cause of Cisco's increasing pressure, Defendants focused their statements on Aruba's purported superior technological differentiation and denied that Cisco was having any success taking customers from Aruba.  These assurances were false and materially misleading as Defendants knew during the Class Period that Cisco won key enterprise accounts from Aruba, as detailed herein, including JC Penny, MGM Grand, and Safeway. . . . Defendants also represented that Aruba's customer "win-rate" was increasing despite Cisco's aggressive sales strategy, and that Aruba's market share was also increasing relative to Cisco's.

But the SAC does not plead facts that would allow the reader to conclude what the plaintiffs assume, namely, that Aruba was losing market share or that Aruba's "win rate" against Cisco was decreasing.  The plaintiffs primarily rely on the allegations that Aruba lost three major customers (JC Penny, MGM Grand, and Safeway) during 2012.  But Aruba had sold its products to more than 20,000 wireless customers worldwide as of 2012 and the WLAN market was obviously growing rapidly, so the loss of three customers (even large ones) does not support an inference that Aruba was losing market share overall or that its win rate was decreasing overall.  Ex. 4 at 4.  The plaintiffs also rely on statements by confidential witnesses to show that the company was losing to Cisco.[2]  But the unsupported opinion of one territory manager, identified

---

[2] The SAC contains various statements by eleven confidential witnesses, most of which concern

1  as confidential witness 11, that "we were just doing all we could to keep the ship from sinking,"
2  cannot substitute for specific factual allegations.  SAC ¶ 72.  And statements by other confidential
3  witnesses that Aruba's management was meeting frequently to try to retain Safeway as a customer
4  and then working to manage the loss of the account, including using the experience as a learning
5  tool, do not speak to Aruba's overall market share or win rate.  SAC ¶ 71.

      Considered against this backdrop, the statements made by Aruba's executives, while perhaps a bit squirrely, were not nearly as nefarious or misleading as the plaintiffs contend.  For example:

- Aruba executives stated: "In our core wireless LAN market, we compete against Cisco.  And we continue to win through the differentiation of our security, scalability and application Aware QOS[ph].  These are all areas where Aruba is the technology leader."  SAC ¶ 72.  The plaintiffs contend this was false, but the SAC contains no allegations to support a conclusion that Aruba was no longer winning when it had a chance to compete with Cisco head-to-head (which is what this statement stands for).  And the SAC provides no basis for concluding that Aruba was not "the technology leader" – to the contrary, the complaint supports that idea by alleging that Cisco needed to bundle to compete against Aruba.
- Similarly, in November 2012, an analyst asked an Aruba executive if Aruba was "seeing every deal."  SAC ¶ 76.  In response, the Aruba executive conceded: "Absolutely we're not seeing every deal.  We're winning almost every deal we see."  SAC ¶ 76.  This was not, as the plaintiffs suggest, a statement about Aruba's overall market share or overall ability to beat Cisco in the competition for customers; it was a boast about Aruba's ability to compete head-to-head.  And the complaint alleges no facts that would prove this boast false.
- Also in November 2012, Orr stated: "For the last quarter, our win rate against our

---

Cisco's bundling strategy and its access to potential customer's top executives, or address the knowledge and intent of Aruba's executives.  The statements concerning Cisco's bundling strategy do not materially add to what was disclosed by Aruba or generally known to analysts.  *See e.g.*, SAC ¶ 66.

4

biggest competitor was improving steadily every month. I can see that. So we are very, very bullish, and I think this trend will continue in our targeted space." SAC ¶ 75; Ex. 18 at 15. A portion of this statement is not actionable because it is forward-looking and/or puffery. With respect to Aruba's "win rate" against Cisco, again the SAC contains no factual allegations that would refute the idea that it improved each month during the quarter in question.

Finally, at the hearing on the motion to dismiss, counsel for the plaintiffs focused less on the theory that Aruba's fraud was grounded in the failure to acknowledge that Cisco had successfully adopted a bundling strategy to avoid head-to-head competition with Aruba's technologically superior WLAN product, and more on the theory that Cisco had actually gained technological superiority over Aruba in the WLAN area itself. Counsel contended that Aruba was obligated to disclose its newfound technological inferiority to investors. But even adopting the dubious assumption that Aruba would be required to made an "admission" to investors on this rather subjective topic, the allegations in the SAC do not support an inference that Cisco's new product was superior. The SAC alleges that confidential witness 11 said that customers were finding Cisco's new wireless network to be a "better product," but this vague hearsay statement does not support a claim that Cisco's product was indeed technologically superior, let alone that Aruba committed securities fraud by not telling investors that its own product was inferior. SAC ¶ 72; s*ee Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 (9th Cir. 2009) (a confidential witness's statements do not satisfy the reliability standard, where the confidential witness's knowledge is based on vague hearsay).

Because the plaintiffs have had three opportunities to state a claim for securities fraud, and because they have not explained how they could cure the defects in the SAC, dismissal is with prejudice.

**IT IS SO ORDERED**.

Dated: February 2, 2015

_____
VINCE CHHABRIA
United States District Judge

5